FILED

IN THE UNITED STATE DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA 2010 DEC 21  P 4: 18

(Alexandria Division)

CLERK
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| HERBERT D. HUGHES,<br>416 Quackenbos Street, N.W.,<br>Washington, D.C. 20001,<br><br>  Plaintiff,<br><br>v.<br><br>NAVY FEDERAL CREDIT UNION,<br>A Virginia corporation,<br>820 Follin Lane<br>Vienna, VA 20180,<br><br>  Serve:  Thomas J. Connelly,<br>    Registered Agent,<br>    820 Follin Lane,<br>    Vienna, VA 20180,<br><br>NANCY  J. LAROCCA,<br>an individual,<br>13380 Hudson Place,<br>Bristow, VA 20136,<br><br>KATHRYN GRAHAM-BAPPLE,<br>an individual,<br>504 Ridgecrest Court,<br>Stafford, VA 22554,<br><br>  Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>CIVIL ACTION NO.  *1: 10 CV 1430*<br>*CmH / IDD*<br><br>JURY DEMAND |

## COMPLAINT

Plaintiff Herbert Hughes, by and through his undersigned counsel, files this Complaint

against his former employer, Defendant Navy Federal Credit Union ("NFCU"), and his former

managers and co-workers, Defendant Nancy LaRocca, and Defendant Kathryn Graham-Bapple,

seeking declaratory judgment, equitable relief, compensatory and punitive damages for injuries

sustained as a result of race discrimination, unlawful retaliation, a hostile work environment and racial harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as amended, and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. §§ 2000 *et seq.* This is also an action against Ms. LaRocca and Ms. Graham-Bapple for tortious interference with Mr. Hughes' at-will employment contract with NFCU.

## PRELIMINARY STATEMENT

1.      On August 8, 2008, Defendant NFCU fired Mr. Hughes because he is black, in retaliation for his criticism of NFCU's discriminatory promotion policies, and "to send a message to other blacks in the Mortgage Default Section, that you will not be promoted."

2.      From 1999 through June 2006, Mr. Hughes' performance appraisals describe him as a professional, effective, diligent, well-organized, efficient and well-liked employee. In fact, one of his supervisors wrote that he "maintains a good working relationship" with his coworkers and "is a positive influence on the overall atmosphere in the branch."

3.      In June 2006, Mr. Hughes first applied for a promotion to a senior-level position, and everything changed: subsequently, he was denied promotions for which he was qualified, singled out for criticism and discipline, given more and harder work than similarly situated white colleagues, and repeatedly blamed for the mistakes of white colleagues. His supervisor even solicited his fellow employees to fabricate complaints about him to the Human Resources Department.

4.      On August 8, 2008, after enduring two years of discriminatory discipline, denial of promotions, and disparate treatment, Mr. Hughes was terminated.

2

## JURISDICTION

5.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. This Court also has supplemental jurisdiction over all state law claims alleged in this Complaint under 28 U.S.C. § 1367.

6.     Virginia permits the issuance of, and Mr. Hughes has obtained, a Right to Sue Notice from the Equal Employment Opportunity Commission in this matter pursuant to 29 C.F.R. § 1601.28.

7.     This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the jurisdictional minimal amount for this Court, exclusive of interests and costs, and is between citizens of different states.

8.     This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 1981.

9.     Defendant NFCU is subject to personal jurisdiction of this Court, pursuant to Va. Code § 8.01-328.1(A).

## VENUE

10.     This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f).

11.     The unlawful employment actions alleged in this Complaint occurred in this judicial district, evidence and employment records relevant to the allegations are maintained in this judicial district, and Mr. Hughes would be employed in this judicial district but for Defendant NFCU's unlawful actions.

12.     Defendant NFCU's corporate headquarters is in the County of Fairfax in the Commonwealth of Virginia, and Defendant NFCU transacts business in the Commonwealth of Virginia.

3

13.     The two individual defendants reside in the Commonwealth of Virginia.

## ADMINISTRATIVE EXHAUSTION

14.     Mr. Hughes has satisfied all administrative prerequisites for filing suit under Title VII.

15.     Mr. Hughes timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission, EEOC Charge No. 570-2008-01923.

16.     Mr. Hughes' EEOC Charge sets forth claims of race discrimination, retaliation, and a hostile work environment.

17.     On September 29, 2010, the EEOC issued Mr. Hughes a Notice of Right to Sue against NFCU, and he timely instituted this suit within 90 days of his receipt of the Notice of Right to Sue.

18.     Mr. Hughes' administrative remedies have been exhausted with respect to his Title VII claims.

## PARTIES

19.     Plaintiff Herbert Hughes is a black male citizen of the United States, who resides in Washington, D.C. Mr. Hughes was employed by Defendant NFCU from November 29, 1999 until his unlawful termination on August 8, 2008.

20.     Defendant NFCU is a federally chartered credit union, incorporated under the laws of Virginia, with its principal place of business in the Commonwealth of Virginia at 820 Follin Lane, Vienna, Virginia 20180. NFCU is an employer within the meaning of Title VII, 42 U.S.C. § 2000e(a)-(b), and at all times relevant to this action, NFCU employed at least fifteen (15) or more employees.

21.     Defendant Nancy J. LaRocca ("Defendant LaRocca") is a citizen of the Commonwealth of Virginia who resides at 13380 Hudson Place, Bristow, Virginia 20136, and at all relevant times was an employee of Defendant NFCU. Defendant LaRocca is being sued in her individual capacity.

22.     Defendant Kathryn Graham-Bapple ("Defendant Graham-Bapple") is a citizen of the Commonwealth of Virginia who resides at 504 Ridge Crest Court, Stafford, Virginia 22554, and at all relevant times was an employee of Defendant NFCU. Defendant Graham-Bapple is being sued in her individual capacity.

## FACTUAL ALLEGATIONS

### Background

23.     Navy Federal Credit Union's Mortgage Default Section handles the accounts of credit union members who are delinquent in their mortgage payment.

24.     The job of mortgage collection "counselors" in the Mortgage Default Section is to contact delinquent members and counsel them as to how to get their accounts up to date.

25.     The 60-day counselors handle the accounts of members who are delinquent by 60 days or less; the 90-day counselors handle the accounts of members who are delinquent by between 60 and 90 days; the 120-day counselors handle the accounts of members who are more than 120 days overdue, but which are not yet in foreclosure.

26.     Between the initial default and foreclosure, a delinquent NFCU member will talk to a 60-day counselor, a 90-day counselor, and a 120-day counselor, each of whom prepares a write-up before passing the account to the next counselor.

27.     A position as a 60-day counselor is an entry-level position in the Mortgage Default Section.

28.     A position as a 120-day counselor is a senior-level position.

29.     120-day counselors are paid more than 60-day and 90-day counselors.

### November 1999- June 2006

30.     On November 29, 1999, Mr. Hughes was hired as a 60-day Consumer Loan Collection Counselor in the Consumer Loan Collections Branch at NFCU's Headquarters.

31.     Between November 29, 1999 and 2005, Mr. Hughes received annual performance appraisals every July.

32.     During this time period, Mr. Hughes' performance appraisals were uniformly positive. They describe a pleasant, effective, and well-liked colleague, who was good at his job.

33.     One appraisal described him as particularly organized and observed that he could "be relied upon to complete his work with minimal or no supervision." It also described Mr. Hughes as diligent and efficient, adding that he had been awarded the "Collector of the Month" award.

34.     In Mr. Hughes' 2003 appraisal, his supervisor wrote that Mr. Hughes "maintains a good working relationship" with coworkers and "is a positive influence on the overall atmosphere in the branch."

35.     Another supervisor praised Mr. Hughes' communication skills, citing his "concise and easily understood notes" and his willingness to assist coworkers and to work overtime as necessary.

36.     Mr. Hughes' 2004 appraisal singled out his attitude and demeanor for particular praise. It noted his "professional image and attitude," his "positive and upbeat" attitude, and his ability to "remain calm and professional when dealing with angry or difficult [credit union clients.]"

6

37.     Mr. Hughes' 2005 appraisal singled out his work ethic, noting that he "consistently arrived at work prior to his scheduled time," that he "worked overtime when necessary to ensure his accounts were all properly worked," and that he "regularly works coworkers queues when they are off or need assistance."

38.     Between 1999 and 2005, Mr. Hughes received an overall annual rating of either "Meets Expectations" or "Successful" in every annual performance appraisal.

39.     Mr. Hughes was offered a merit raise at the end of each appraisal period between 1999 and 2005.

40.     Upon information and belief, between 1999 and 2005, no black employee in NFCU's Mortgage Default Section ever received an overall rating of "Highly Successful." Management restricted awarding overall "Highly Successful" ratings to its white employees during this time period.

### June 2006-May 2007

41.     In June 2006, Mr. Hughes applied for a senior-level position in the Mortgage Default Branch, and the terms, conditions and privileges of his employment immediately deteriorated.

42.     Defendant NFCU required all applicants for a promotion to take an examination.

43.     In June 2006, eight people, including Mr. Hughes, took the examination.

44.     When Mr. Hughes took the examination in June 2006, there were no black senior-level mortgage collection counselors at NFCU.

45.     Upon information and belief, there had never been a black senior-level mortgage collection counselor in the Mortgage Default Branch between November 1999 and June 2006.

46.     Mr. Hughes was the only black applicant to take the examination.

47.     Mr. Hughes was the only applicant to pass the examination.

48.     In late June 2006, Mr. Hughes was interviewed for the position by a three-person panel consisting of Delana Newman, Supervisor of Records, Nancy LaRocca, his supervisor, and James Little, his manager.

49.     Some of the white applicants who had failed the written examination were nevertheless interviewed for the senior-level position. However none of these white applicants were subjected to a three-person panel interview.

50.     While Mr. Hughes' application for a promotion was pending, Defendant LaRocca, Mr. Hughes' supervisor, and Defendant Graham-Bapple, a bankruptcy specialist, approached another employee, Melissa Reaktenwalt, who is white, and brought her to a meeting at Human Resources.

51.     At the meeting, Defendants LaRocca and Graham-Bapple encouraged Ms. Reaktenwalt to report that she was offended by Mr. Hughes' conduct in the office, specifically his alleged flirtation with a white woman.

52.     Ms. Reaktenwalt reported that she had never witnessed Mr. Hughes being inappropriate in the office or flirting with the woman in question.

53.     Ms. Reaktenwalt subsequently transferred out of Mr. Hughes' department and wrote a letter to management at NFCU reporting Defendants LaRocca and Graham-Bapple's conduct during the meeting at Human Resources.

54.     In her letter, Ms. Reaktenwalt also speculated that because she was prompted to lie about Mr. Hughes, other employees had been prompted to do so as well.

55.     In July 2006, Delana Newman informed Mr. Hughes that he had done very well in his interview, but that Mr. Hughes could not receive the promotion because his supervisor

Defendant LaRocca had voted not to give him the promotion.

56.     Between November 2005 and December 2006, five white employees were promoted to senior-level positions in Mr. Hughes' Department: Janet Johnson (November 2005), Douglas Dean (December 2005), Ian Hicks (September 2006), Defendant Graham-Bapple (October 2006), and Erin Varnue (December 2006).

57.     Upon information and belief, the five individuals listed above were promoted to senior-level positions even though (i) none had passed the written examination, (ii) all had been interviewed by only one or two people, (iii) none were subjected to a three-person panel interview, and (iv) all were promoted within one week after interviewing for the position.

58.     Upon information and belief, between 2000 and 2006, only white employees were promoted to senior-level positions within the Mortgage Default Department.

59.     In September 2006, Mr. Hughes' manager informed him that he was not being promoted, was not allowed to transfer out of the department, and was being placed on "probation." Employees on probation were ineligible for promotion.

60.     Mr. Hughes believes that he was placed on probation as a warning to himself and other black men not to apply for promotions to senior-level positions. As of October 2006, he observed that there were no blacks in senior-level counselor positions in the Mortgage Collections Section, and that similarly situated white employees were not punished for seeking senior-level positions.

61.     On October 18, 2006, Mr. Hughes met with Ellen Feeney, a Manager in the Human Relations Department and made a formal complaint alleging race discrimination within the Mortgage Default Section. Kandice Kaiser, a Compliance Officer, was also present at this meeting.

9

62.     During this meeting, Mr. Hughes informed Ms. Feeney that he believed he had been denied a promotion to a senior-level position because he was black.

63.     Mr. Hughes explained to Ms. Feeney that he was the only candidate who had passed the written examination.

64.     Mr. Hughes also explained to Ms. Feeney that he had not been promoted to a senior-level position while other white employees, who had not passed the examination, had been promoted to senior-level management positions.

65.     Mr. Hughes also explained to Ms. Feeney that similarly situated, white employees, who had failed the written exam, had been promoted to senior-level positions within seven (7) business days after their interview.

66.     Mr. Hughes pointed out to Ms. Feeney that he was the only black candidate and the only candidate who was subjected to a three-person panel interview.

67.     During his meeting with Ms. Feeney, Mr. Hughes told her that there were no black employees in senior-level positions in the Mortgage Default Section.

68.     Upon information and belief, Mr. Hughes' supervisor, Defendant LaRocca, was informed of his complaint alleging race discrimination.

69.     Upon information and belief, Mr. Hughes' manager, James Little, was informed of Mr. Hughes' complaint alleging race discrimination.

70.     On November 21, 2006, Mr. Hughes sent a letter to Joan Cox, Vice President of Mortgage Services.

71.     Mr. Hughes sent a copy of his November 21, 2006 letter to Cutler Dawson, President of NFCU, Mary McDuffy, Vice President of the Mortgage Department, Thomas

10

Steele, another Vice President of the Mortgage Department, and Louise Foreman, Vice President of Human Resources.

72.    In his November 21st letter, Mr. Hughes substantially repeated the concerns he expressed to Ms. Feeney, adding that Ms. Feeney failed to take the actions mandated under Defendants' anti-discrimination policies.

73.    On January 2, 2007, Melissa Reakenwalt, a white coworker, wrote a letter to the Vice President of Human Resources stating that Defendant LaRocca had sabotaged Mr. Hughes' application for a promotion "to send a message to other blacks in the Mortgage Default Section, that you will not be promoted."

74.    Approximately two weeks after receiving Ms. Reakenwalt's letter, management told Mr. Hughes that he would be offered a promotion to 120-day counselor.

75.    On March 19, 2007, Mr. Hughes was taken off "probation" and promoted to the senior-level position of 120-day counselor.

76.    In March 2007, when Mr. Hughes was promoted, he was the only black 120-day counselor in the department.

77.    During Mr. Hughes' tenure as a 120-day counselor, Mr. Hughes continued to be treated differently from, and worse than, his white counterparts. Specifically, he was given more work to do with less support than similarly situated white colleagues, he was singled out for criticism, and he was repeatedly blamed for the mistakes of his white colleagues, for which he was ultimately terminated.

### May 2007 – December 2007

78.    In May 2007, a number of positions became available in the Mortgage Collections Branch, and many promotions and transitions occurred.

79.    No black employees were promoted during this transition period. Only whites were promoted. For example, Defendant LaRocca was promoted to Manager of the Mortgage Collections Department (the position previously held by James Little). Mr. Little was promoted to Assistant Vice President of the Department.

80.    In late September 2007 or early October 2007, the position of Business Analyst became available, and Mr. Hughes applied for it.

81.    Mr. Hughes was not interviewed for the position, which was eventually filled by Jennifer Felts, who is white.

82.    As the only black 120-day counselor, Mr. Hughes was quickly aware that he was being treated differently from his white colleagues in the Department.

83.    For example, in October 2007, Joanne Anderson, another 120-day counselor, accused Mr. Hughes of taking files from her desk. Mr. Hughes' desk was searched. The files were eventually located among Ms. Anderson's own files.

84.    Upon information and belief, no white colleagues' desks were searched for the missing files.

85.    In December 2007, Joanne Anderson, who had blamed Mr. Hughes for stealing her misplaced files, retired. Management then required Mr. Hughes to handle her mortgage collection accounts as well as his own.

86.    Mr. Hughes did not receive any increase in salary when he took over Ms. Anderson's additional duties and responsibilities.

87.    Upon reviewing Ms. Anderson's nearly 300 outstanding accounts, Ms. Hughes realized that she had approximately 75 to 100 second mortgage accounts that had not been

properly handled.  Mr. Hughes was instructed to handle every one of the improperly handled accounts without being provided any assistance.

88.    However, when Ms. Anderson had been in charge of these 300 accounts, she was provided assistance.

89.    In mid-December 2007, NFCU member delinquencies had begun to mount, and the national foreclosure crisis loomed.

90.    According to RealtyTrac's 2007 "U.S. Foreclosure Market Report," as of December 31, 2007, foreclosure activity in the United States, including the total number of mortgage defaults handled by lending institutions, such as NFCU, had increased approximately 75 percent since December of 2006.

91.    According to the National Delinquency Survey from the Mortgage Bankers Association, as of December 31, 2007, the total delinquency rate for mortgage loans on one-to-four unit residential properties (excluding loans in the foreclosure process) rose 87 percent during 2007.

92.    NFCU did not increase its number of mortgage collection counselors sufficiently to keep pace with the tremendous rise in mortgage loan delinquencies during 2007.

93.    As of December 2007, NFCU had not hired an adequate number of 60-day or 90-day counselors to handle the ever-increasing number of delinquencies, and there were only three 120-day counselors.

94.    By December 2007, Mr. Hughes was responsible for (i) drafting approximately 30 write-ups for delinquent mortgage accounts each week, (ii) assisting the 60-day and 90-day counselors, (iii) sending out demand letters to delinquent clients, (iv) training the new 120-day counselor, Marie Hamilton, who had replaced Ms. Anderson, (v) mentoring the 60-day and 90-

13

day counselors, (vi) handling numerous telephone calls for his supervisors each day, and (vii) speaking with NFCU customers who were more than 120 days delinquent in their mortgage payments.

95.     In December 2007, Mr. Hughes also rewrote the year-end procedures manual, which was adopted throughout the Mortgage Default Section. Mr. Hughes did not receive any credit or acknowledgement from his supervisors for rewriting the procedure manual.

96.     Upon information and belief, white 120-day counselors were not assigned comparably heavy workloads.

97.     In December 2007, Defendant LaRocca reprimanded Mr. Hughes for not drafting a sufficient number of write-ups each week.

98.     White employees were not reprimanded when they failed to make their quota of weekly write-ups.

99.     By December 2007, given the increase in delinquencies, the 60-day and 90-day counselors were not always able to complete their write-ups in a timely fashion, and the information provided by the 60-day and 90-day counselors became less reliable.

100.    The number of write-ups completed each week by the 120-day counselors depended on the information provided by the 60-day and 90-day counselors. As a result, all 120-day counselors were having difficulty making their weekly quotas in December 2007.

101.    Management solicited ideas for reducing the number of delinquent accounts.

102.    Mr. Hughes suggested the idea of a no-cost modification for delinquent accounts and submitted a written proposal.

103.    Management ignored Mr. Hughes' idea.

104.    Five months later, a white employee would suggest the same idea orally at a meeting, and Defendant LaRocca would implement it.

105.    Throughout 2007, Mr. Hughes was blamed for the following errors of other employees and counselors:

      a.      Prematurely initiating foreclosure on a home;

      b.      Prematurely doing a pre-foreclosure write-up of an account being monitored for senior sale; and

      c.      Prematurely recommending a loan for foreclosure while the account was still in active loss mitigation.

106.    After each reprimand, Mr. Hughes would explain to Defendant LaRocca or Mr. Little that the account at issue was not one on which he was working at the time of the error.

107.    In the case of the premature initiation of a foreclosure proceeding, Mr. Hughes further pointed out to both Defendant LaRocca and Mr. Little that he was not authorized to initiate foreclosure proceedings and had never done so.

108.    Upon information and belief, white 120-day counselors were not blamed for the mistakes of their colleagues.

### January 2008 – August 2008

109.    In January 2008, Mr. Hughes applied for a supervisor position in the Herndon, Virginia office. In July 2008, the promotion was granted to Victoria Ryan, who is white. Christopher Lockbaum, who is white, was promoted to Ms. Ryan's former position.

110.    During this same time, a white 60-day counselor named Mr. Russell applied and was granted a supervisor position in the Pensacola, Florida office.

111.    In February 2008, Mr. Hughes suggested a streamlined approach for dealing with pre-foreclosure delinquencies, which involved waiting an additional month before initiating foreclosure proceedings. Mr. Hughes began waiting an extra month before beginning the write-up because credit union members who were delinquent after four months often became current after five months.

112.    In March 2008, Mr. Little implemented Mr. Hughes' one-month-delay approach as a company-wide policy but did not credit Mr. Hughes with the idea.

113.    Upon information and belief, white mortgage counselors received acknowledgment and credit for their suggestions that were adopted by NFCU.

114.    In March 2008, Ms. Ryan and Defendant LaRocca informed Mr. Hughes that he should no longer assist 60-day counselors with their problem accounts. However, when 60-day counselors needed assistance, they nonetheless continued to seek out Mr. Hughes' help and support.

115.    Between January and March 2008, Mr. Hughes repeatedly spoke with Mr. Little and Defendant LaRocca to request assistance with the first- and second-mortgage write-ups.

116.    During this period, the foreclosure crisis was placing enormous pressure on NFCU's pre-foreclosure counselors. The department was unable to keep up with the volume of member delinquencies. Mr. Hughes was one of only three 120-day counselors responsible for drafting all first- and second-mortgage write-ups.

117.    These requests were denied, but he was continually promised that "help is on the way."

118.    Around mid-to-late March 2008, Christopher Lockbaum, was hired as a 120-day counselor.

119.   Mr. Hughes trained Mr. Lockbaum and taught him how to handle mortgage "write-ups."

120.   Mr. Lockbaum is white.

121.   By April 2008, Mr. Lockbaum was qualified to assist Mr. Hughes with the first- and second-mortgage write-ups.

122.   In April 2008, Mr. Lockbaum was placed in charge of second mortgage write-ups, and Mr. Hughes' responsibilities were restricted to first mortgage write-ups.

123.   In May 2008, despite being responsible only for second-mortgage write-ups, Mr. Lockbaum fell behind and a backlog of second-mortgage write-ups began to accumulate.

124.   Even though he was not making his weekly quota, Mr. Lockbaum was not reprimanded or relieved of his responsibility for second-mortgage write-ups. Instead, Defendant LaRocca assigned three people, including Mr. Hughes, to assist Mr. Lockbaum with his work.

125.   When Mr. Hughes had been in charge of both first- and second-mortgage write-ups, he had been given no such assistance. When Mr. Lockbaum was assigned only to second-mortgage write-ups, he was given three people to assist him.

126.   In May 2008, Mr. Lockbaum presented the idea of no-cost modifications for delinquent accounts to Defendant LaRocca, and NFCU began to implement this idea. This "no-cost modification" plan was the same one that Defendant LaRocca had ignored when Mr. Hughes first proposed it in December 2007.

127.   Mr. Lockbaum's "no-cost modification" plan was met with great enthusiasm, and no one seemed to remember that Mr. Hughes had made this same suggestion five months earlier.

128.   In mid-May 2008, Ms. Ryan and Defendant LaRocca held a meeting with all the 120-day counselors. Defendant LaRocca told the group that it was Mr. Hughes' fault that the

group as a whole had fallen behind.  She did not explain in what way Mr. Hughes had contributed to the crisis.

129.    Upon information and belief, Mr. Hughes was not in fact responsible for the spike in home-mortgage delinquencies that occurred in 2007 and 2008, nor was he responsible for the difficulty NFCU had in processing the increased number of delinquencies.

130.    White colleagues who were also 120-day counselors were not blamed for the spike in home-mortgage delinquencies or for the difficulty the Mortgage Default Section at NFCU had in handling the increase in delinquencies.

131.    During this May 2008 meeting, Mr. Lockbaum introduced the idea of a no-cost modification, which Mr. Hughes had suggested in December 2007.

132.    In May 2008, Mr. Hughes introduced another new idea, a delinquency rider, called a "modified modification."  Upon information and belief, this idea was eventually adopted after Mr. Hughes' termination.

133.    In July 2008, Mr. Lockbaum was promoted and became Mr. Hughes' supervisor.

134.    In August 2008, Defendant NFCU terminated Mr. Hughes.

135.    In terminating Mr. Hughes, Defendant NFCU cited the errors by other employees for which Mr. Hughes had been reprimanded between 2006 and 2008.

136.    After Mr. Hughes was fired, he was replaced by a white employee.

### CAUSES OF ACTION

### COUNT ONE
### TITLE VII RACE DISCRIMINATION
### (AGAINST CORPORATE DEFENDANT NFCU)
### in violation of Title VII, 42 U.S.C. § 2000e *et seq.*

137.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in each preceding paragraph as if fully set forth herein.

138.    Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an employee on the basis of race with respect to the terms, conditions or privileges of employment.

139.    Corporate Defendant NFCU is an "employer" as defined in Title VII.

140.    Plaintiff is an "employee" as defined in Title VII.

141.    NFCU's disparate treatment, discriminatory discipline, failure to promote, termination and other unlawful actions were adverse employment actions taken against Plaintiff because of his race, African-American or black. NFCU's actions constitute race discrimination and violate Title VII, as amended.

142.    From the date Mr. Hughes applied for a promotion, he was subject to disparate treatment because of his race, and Defendant NFCU sought to limit or eliminate minority access to senior-level positions.

143.    Such disparate treatment included, *inter alia*, denying him promotions for which he was qualified, soliciting fellow employees to lie about his workplace performance, subjecting him to discriminatory discipline, overloading him with work, blaming him for the mistakes of white colleagues, and ultimately terminating him.

144.    His ultimate termination in August 2008 was the cumulative effect of the above-cited incidents of disparate treatment, which occurred over a two-year period beginning in June 2006.

145.    As a direct and proximate result of NFCU's unlawful discrimination, Plaintiff suffered, and continues to suffer, loss of compensation, wages, related benefits and opportunities, a loss of future professional opportunities and future income and damage to his professional reputation. Further, Plaintiff suffered humiliation, embarrassment, pain and suffering, shame,

ridicule, stress, severe mental anguish and emotional distress, and will continue to suffer such losses and damages in the future.

146.    Defendants engaged in the discriminatory actions described above with malice, or with reckless disregard to Plaintiff's legal rights.

### General Disparate Treatment

147.    For the five years before Mr. Hughes applied for a promotion to a senior-level position, he had always performed as a satisfactory NFCU employee, earning praise and merit raises at each annual appraisal.

148.    Because he applied for the promotion, Mr. Hughes was placed on disciplinary probation, making him ineligible for future promotions. When white colleagues applied for promotions to senior-level positions, they were not disciplined at all.

149.    After he applied for a promotion, Mr. Hughes was overloaded with work, reprimanded for the mistakes of his white colleagues, denied credit for his accomplishments, denied subsequent promotions, and ultimately terminated.

150.    White employees in the Mortgage Default Section who applied for promotions were not subsequently placed on probation, overloaded with work, reprimanded for the mistakes of their colleagues, denied credit for their accomplishments, denied subsequent promotions, and terminated.

151.    After he applied for a promotion, Mr. Hughes' supervisor, Defendant LaRocca, solicited his fellow employees to fabricate complaints about him to the NFCU Human Resources Department.

152.    When similarly situated white colleagues applied for promotions, Defendant LaRocca did not solicit fellow employees to fabricate complaints about them to the NFCU Human Resources Department.

### Failure to Promote

153.    Mr. Hughes applied for an open senior-level position in June 2006.

154.    Mr. Hughes applied for an open Business Analyst position in late September 2007 or early October 2007

155.    Mr. Hughes applied for an open supervisory position in the Herndon, Virginia office in 2008.

156.    Black employees are under-represented in senior-level and management positions at NFCU.

157.    Mr. Hughes was qualified for each position, but was nonetheless denied each promotion.  White colleagues were promoted instead.

### Discriminatory Discipline

158.    In 2007, when Mr. Hughes was placed in charge of second mortgage write-ups, he had difficulty meeting his weekly quota and was reprimanded.

159.    Shortly thereafter, a white colleague was placed in charge of second mortgage write-ups in the same department and under the same supervisor.  The white colleague also failed to make his weekly quota.  The white colleague was not reprimanded, demoted or fired.  Instead, three employees were instructed to assist him, and he was promoted.

160.    For two years, Mr. Hughes was repeatedly reprimanded for the mistakes of other employees.

161.    White colleagues were not reprimanded for the mistakes of other employees.

162. As a cumulative result of these incidents of discriminatory discipline, Mr. Hughes was ultimately discharged.

### Unlawful Termination

163. Mr. Hughes was performing his job duties at a level that met Defendants' legitimate expectations when he was discharged. He had received favorable performance reviews; he had contributed useful suggestions that helped Defendants operate more efficiently; and he regularly assisted co-workers.

164. Mr. Hughes was discharged because of a number of errors made by other employees and falsely attributed to him by Defendant LaRocca.

165. Upon information and belief, white employees were not terminated as a result of errors that their supervisors and managers mistakenly attributed to them.

### Hostile Work Environment/Racial Harassment

166. For more than two years, Mr. Hughes was subjected to a hostile work environment and harassment by the Defendants when they denied Mr. Hughes promotions, singled him out for criticism, overloaded him with work, subjected him to discriminatory discipline, falsely accused him of taking property from his white coworker, and blamed him for the mistakes of white colleagues.

167. Defendants' conduct was not welcomed by Mr. Hughes.

168. Defendants' conduct was motivated by the fact that Mr. Hughes is African-American or black.

169. The conduct was so severe or pervasive that a reasonable person in Mr. Hughes' position would find the work environment to be hostile or abusive, and Mr. Hughes believed his work environment to be hostile or abusive.

170. Defendant NFCU knew or should have known of the racially hostile work environment that Mr. Hughes was experiencing but failed to take any actions to stop the hostile or abusive conduct.

171. As a result the hostile work environment, Mr. Hughes suffered tangible adverse employment actions, including disparate treatment, discriminatory discipline, failure to promote, and ultimately termination.

### Malice

172. In soliciting employees to bring false complaints about Mr. Hughes to Human Resources, Defendant LaRocca and Defendant Graham-Bapple acted with malice, and with reckless disregard for Mr. Hughes' legal rights.

173. In denying Mr. Hughes promotions, singling him out for criticism, overloading him with work, subjecting him to discriminatory discipline, and blaming him for the mistakes of white colleagues, which led ultimately to his termination, his direct and indirect supervisors Defendant LaRocca, Defendant Graham-Bapple, and Mr. Little acted with malice and with reckless disregard for Mr. Hughes' legal rights.

174. Defendants' actions described above directly and proximately have caused, and continue to cause, Plaintiff to suffer loss of compensation, wages, related benefits and opportunities, a loss of future professional opportunities and future income and damage to his professional reputation. Further, Plaintiff has suffered humiliation, embarrassment, pain and suffering, shame, ridicule, stress, severe mental anguish and emotional distress, and he will continue to suffer such losses and damages in the future.

**COUNT TWO**
**SECTION 1981 RACE DISCRIMINATION**
**(AGAINST ALL DEFENDANTS)**
**in violation of 42 U.S.C. § 1981, et seq.**

175.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in each preceding paragraph as if fully set forth herein.

176.    Section 1981 of the Civil Rights Act of 1866, as amended, protects the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship, including at-will employment contracts. Section 1981 prohibits race-based discrimination in at-will employment relationships.

177.    NFCU's disparate treatment, discriminatory discipline, failure to promote, termination and other unlawful actions violated Mr. Hughes' rights and denied him the full and equal benefit of the laws guaranteed by Section 1981.

178.    Defendants, jointly and severally, discriminated against Plaintiff because of his race, African-American or black. NFCU's actions constitute race discrimination and violate Section 1981, as amended.

179.    Each of the Defendants were aware of Plaintiff's rights, yet each knowingly, negligently, intentionally, with malice and/or with reckless disregard acted in a manner to deprive Plaintiff of his legal rights without justification.

180.    From the date Mr. Hughes applied for a promotion, he was subject to disparate treatment because of his race and Defendant NFCU sought to limit or eliminate minority access to senior-level positions.

181.    From the date Mr. Hughes applied for a promotion, he was subjected to discriminatory discipline because of his race and Defendant NFCU sought to limit or eliminate minority access to senior-level positions.

24

182.   From the date Mr. Hughes applied for a promotion, he was blamed for the mistakes of his white colleagues; he was ultimately terminated and the misattributed errors where cited as the reason for his termination.  In blaming him and then terminating him for the mistakes of white employees, for which Mr. Hughes was not responsible, Defendant NFCU acted with discriminatory intent.

183.   As a direct and proximate result of NFCU's unlawful discrimination, Plaintiff suffered, and continues to suffer, loss of compensation, wages, related benefits and opportunities, a loss of future professional opportunities and future income and damage to his professional reputation.  Further, Plaintiff has suffered humiliation, embarrassment, pain and suffering, shame, ridicule, stress, severe mental anguish and emotional distress, and he will continue to suffer such losses and damages in the future.

184.   Defendants engaged in the discriminatory actions described above with malice, or with reckless disregard to the Plaintiff's legal rights.

### Disparate Treatment

185.   When Mr. Hughes applied for a promotion to a senior-level position, he had always performed as a satisfactory employee.

186.   After he applied for the promotion, Mr. Hughes was placed on disciplinary probation, making him ineligible for future promotions.  When white colleagues applied for promotions to senior-level positions, they were not disciplined.

187.   After he applied for a promotion, Mr. Hughes was overloaded with work, reprimanded for the mistakes of his white colleagues, denied credit for his accomplishments, denied subsequent promotions, and ultimately terminated.

188.    White colleagues in the Mortgage Default Section who requested promotions were not subsequently overloaded with work, reprimanded for the mistakes of white colleagues, denied credit for their accomplishments, denied subsequent promotions, and terminated.

### Failure to Promote

189.    Mr. Hughes applied for an open Senior-level position in June 2006.

190.    Mr. Hughes applied for an open Business Analyst position in late September 2007 or early October 2007

191.    Mr. Hughes applied for an open supervisor position in the Herndon, Virginia office in 2008.

192.    Mr. Hughes was qualified for each position, but was nonetheless denied each promotion. White colleagues were promoted instead.

### Discriminatory Discipline

193.    In 2007, when Mr. Hughes was placed in charge of second mortgage write-ups, he had difficulty meeting his weekly quota and he was reprimanded.

194.    Shortly thereafter, a white colleague was placed in charge of second mortgage write-ups in the same department and under the same supervisor. The white colleague also failed to make his weekly quota. The white colleague was not reprimanded, demoted or fired. Instead, three employees were instructed to assist him and he was promoted.

195.    For two years, Mr. Hughes was repeatedly reprimanded for the mistakes of other employees.

196.    White colleagues were not reprimanded for the mistakes of other employees.

197.    As a cumulative result of these incidents of discriminatory discipline, particularly the misattribution of others' errors, Mr. Hughes was ultimately discharged.

**Unlawful Termination**

198.    Mr. Hughes was performing his job duties at a level that met Defendants'
legitimate expectations when he was discharged. He had received favorable performance
reviews, had contributed useful suggestions that helped Defendant NFCU operate more
efficiently, and regularly assisted his coworkers.

199.    Mr. Hughes was discharged because of a number of errors made by other
employees and falsely attributed to him by Defendant LaRocca.

200.    Upon information and belief, white employees were not terminated as a result of
errors that their supervisors and managers mistakenly attributed to them.

**Hostile Work Environment/ Racial Harassment**

201.    For more than two years, Mr. Hughes was subjected to a hostile work
environment and harassment by the Defendants when they denied Mr. Hughes promotions,
singled him out for criticism, overloaded him with work, subjected him to discriminatory
discipline, falsely accused him of taking property from his white coworker, and blamed him for
the mistakes of white colleagues.

202.    Defendants' conduct was not welcomed by Mr. Hughes.

203.    Defendants' conduct was motivated by the fact that Mr. Hughes is African-
American or black.

204.    The conduct was so severe or pervasive that a reasonable person in Mr. Hughes'
position would find the work environment to be hostile or abusive, and Mr. Hughes believed his
work environment to be hostile or abusive.

205. Defendant NFCU knew or should have known of the racially hostile work environment that Mr. Hughes was experiencing but failed to take any actions to stop the hostile or abusive conduct.

206. As a result the hostile work environment, Mr. Hughes suffered tangible adverse employment actions, including disparate treatment, discriminatory discipline, failure to promote, and ultimately termination.

### Malice

207. In soliciting employees to bring false complaints about Mr. Hughes to Human Resources, Defendant LaRocca and Defendant Graham-Bapple acted with malice, and with reckless disregard for Mr. Hughes' rights.

208. In denying Mr. Hughes promotions, singling him out for criticism, overloading him with work, subjecting him to discriminatory discipline, and blaming him for the mistakes of white colleagues, which led ultimately to his termination, his direct and indirect supervisors Defendant LaRocca, Defendant Graham-Bapple, and Mr. Little acted with malice and with reckless disregard for Mr. Hughes' legal rights.

209. Defendants' actions described above directly and proximately have caused, and continue to cause, Plaintiff to suffer loss of compensation, wages, related benefits and opportunities, a loss of future professional opportunities and future income and damage to his professional reputation. Further, Plaintiff has suffered humiliation, embarrassment, pain and suffering, shame, ridicule, stress, severe mental anguish and emotional distress, and he will continue to suffer such losses and damages in the future.

**COUNT THREE**
**TITLE VII RETALIATION**
**(AGAINST CORPORATE DEFENDANT NFCU)**
**in violation of 42 U.S.C.A. § 2000e *et seq.***

210.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in each preceding paragraph as if fully set forth herein.

211.    It is unlawful under Title VII for an employer to discriminate against any of its employees or applicants for employment because an employee or applicant has opposed any practice made unlawful by Title VII.

212.    Mr. Hughes engaged in protected activity by opposing what he reasonably believed was unlawful discrimination. Mr. Hughes complained to Human Resources personnel as well as to management about racial discrimination he was experiencing.

213.    Defendants took adverse employment actions against Mr. Hughes for engaging in protected activity. In the six months following his complaint, Defendant LaRocca subjected Mr. Hughes to retaliatory animus by giving him more work than similarly situated white colleagues, by denying him the support necessary to complete his work, and by reprimanding him for the mistakes of fellow employees.

214.    Defendants' retaliatory actions were causally connected to Mr. Hughes' protected activity.

215.    As a result of Defendant LaRocca's actions, Mr. Hughes was ultimately terminated.

216.    Until he complained about race discrimination in his workplace, Mr. Hughes' work assignments had been comparable to the work assignments of similarly titled colleagues.

217.    Until he complained about discrimination in his workplace, Mr. Hughes had not been denied the assistance necessary to complete the work he was assigned.

218.   Until he complained about discrimination in his workplace, Mr. Hughes was not reprimanded for the mistakes of fellow employees that he did not supervise.

219.   Mr. Hughes was terminated because the mistakes of fellow employees had been misattributed to him.

220.   Mr. Hughes was singled out for criticism, overloaded with work, blamed for others' mistakes, and ultimately terminated because he complained about NFCU's discriminatory failure to promote him in accordance with the normal procedures of the Mortgage Default Section.

221.   The retaliatory actions by Defendants were so adverse that they would have dissuaded or discouraged a reasonable employee from making or supporting a charge of discrimination.

222.   Defendants' actions described above directly and proximately have caused, and continue to cause, Plaintiff to suffer loss of compensation, wages, related benefits and opportunities, a loss of future professional opportunities and future income and damage to his professional reputation. Further Plaintiff has suffered humiliation, embarrassment, pain and suffering, shame, ridicule, stress, severe mental anguish and emotional distress, and he will continue to suffer such losses and damages in the future.

223.   Defendant engaged in the discriminatory and retaliatory actions described above with malice, or with reckless disregard to the Plaintiff's legal rights. Defendant willfully, recklessly and intentionally retaliated against Plaintiff because of his engagement in the protected activity set forth above.

## COUNT FOUR
### SECTION 1981 RETALIATION
### (AGAINST ALL DEFENDANTS)
### in violation of 42 U.S.C. § 1981 *et seq.*

224.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in each preceding paragraph as if fully set forth herein.

225.    It is unlawful under Section 1981 for an employer to retaliate against any employee because an employee has alleged race discrimination in violation of the law.

226.    Defendants violated Section 1981 when they retaliated against Mr. Hughes for alleging that he has been discriminated on the basis of race.

227.    Mr. Hughes engaged in protected activity by opposing what he reasonably believed was unlawful discrimination. He complained to Human Resources personnel as well as to management about racial discrimination he was experiencing.

228.    Defendants took adverse employment actions against Mr. Hughes for engaging in protected activity. In the six months following his complaint, Defendant LaRocca subjected Mr. Hughes to retaliatory animus by giving him more work than similarly situated white colleagues, by denying him the support necessary to complete his work, and by reprimanding him for the mistakes of fellow employees.

229.    Defendants' retaliatory actions were causally connected to Mr. Hughes' protected activity.

230.    As a result of Defendant LaRocca's actions, Mr. Hughes was ultimately terminated.

231.    Until he complained about race discrimination in his workplace, Mr. Hughes' work assignments had been comparable to the work assignments of similarly titled colleagues.

232.   Until he complained about discrimination in his workplace, Mr. Hughes had not been denied the assistance necessary to complete the work he was assigned.

233.   Until he complained about discrimination in his workplace, Mr. Hughes was not reprimanded for the mistakes of fellow employees that he did not supervise.

234.   Mr. Hughes was terminated because the mistakes of fellow employees had been misattributed to him.

235.   Mr. Hughes was singled out for criticism, overloaded with work, blamed for others' mistakes, and ultimately terminated because he complained about NFCU's discriminatory failure to promote him in accordance with the normal procedures of the Mortgage Default Section.

236.   The retaliatory actions by Defendants were so adverse that they would have dissuaded or discouraged a reasonable employee from making or supporting a charge of discrimination.

237.   Defendants' actions described above directly and proximately have caused, and continue to cause, Plaintiff to suffer loss of compensation, wages, related benefits and opportunities, a loss of future professional opportunities and future income and damage to his professional reputation. Further, Plaintiff has suffered humiliation, embarrassment, pain and suffering, shame, ridicule, stress, severe mental anguish and emotional distress, and he will continue to suffer such losses and damages in the future.

238.   Defendant engaged in the discriminatory and retaliatory actions described above with malice, or with reckless disregard to the Plaintiff's legal rights. Defendant willfully, recklessly and intentionally retaliated against Plaintiff because of his engagement in the protected activity set forth above.

<u>COUNT FIVE</u>
**TORTIOUS INTERFERENCE WITH AT-WILL CONTRACTUAL RELATIONSHIP
(AGAINST DEFENDANT LA ROCCA)**

239.    Plaintiff re-alleges and incorporates by reference each and every allegation

contained in each preceding paragraph as if fully set forth herein.

240.    Mr. Hughes was an employee of NFCU, and Defendant LaRocca was aware that

Mr. Hughes was an employee of NFCU.

241.    Defendant LaRocca knew of Mr. Hughes' at-will contractual relationship with

NFCU.

242.    By soliciting false human resources complaints and encouraging fellow

employees to lie about him, Defendant LaRocca intentionally and maliciously interfered with the

at-will contractual relationship between Mr. Hughes and NFCU using improper methods.

243.    Soliciting false human-resources complaints violates an established standard of

the banking and credit union professions and constitutes unethical conduct.

244.    By falsely attributing mistakes by other white employees to Mr. Hughes,

Defendant LaRocca intentionally and maliciously interfered with the contractual relationship

between Mr. Hughes and NFCU using improper means.

245.    Falsely attributing white employee errors to black employees is improper as it

violates an established standard of the banking and credit union professions and constitutes

unethical conduct.

246.    It was not within the scope of Defendant LaRocca's job as supervisor to solicit

false accusations about employee behavior.

247.    Defendant LaRocca's actions described above directly and proximately have

caused, and continue to cause, Plaintiff to suffer loss of compensation, wages, related benefits

and opportunities, a loss of future professional opportunities and future income and damage to his professional reputation. Further, Plaintiff has suffered humiliation, embarrassment, pain and suffering, shame, ridicule, stress, severe mental anguish and emotional distress, and he will continue to suffer such losses and damages in the future.

**COUNT SIX**
**TORTIOUS INTERFERENCE WITH AT-WILL CONTRACTUAL RELATIONSHIP**
**(AGAINST DEFENDANT GRAHAM-BAPPLE)**

248.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in each preceding paragraph as if fully set forth herein.

249.    Mr. Hughes was an employee of NFCU, and Defendant Graham-Bapple was aware that Mr. Hughes was an employee of NFCU.

250.    Defendant Graham-Bapple knew of Mr. Hughes' at-will contractual relationship with NFCU.

251.    By soliciting false human resources complaints and encouraging fellow employees to lie about him, Defendant Graham-Bapple intentionally and maliciously interfered with the contractual relationship between Mr. Hughes and NFCU by using improper methods.

252.    Soliciting false human-resources complaints violates an established standard of the banking and credit union professions and constitutes unethical conduct.

253.    By falsely attributing mistakes by other white employees to Mr. Hughes, Defendant Graham-Bapple intentionally and maliciously interfered with the contractual relationship between Mr. Hughes and NFCU using improper means.

254.    Falsely attributing white employee errors to black employees is improper as it violates an established standard of the banking and credit union professions and constitutes unethical conduct.

34

255.    It was not within the scope of Defendant Graham-Bapple's job as bankruptcy specialist to solicit false accusations about employee behavior.

256.    Defendant Graham-Bapple's actions described above directly and proximately have caused, and continue to cause, Plaintiff to suffer loss of compensation, wages, related benefits and opportunities, a loss of future professional opportunities and future income and damage to his professional reputation.  Further, Plaintiff has suffered humiliation, embarrassment, pain and suffering, shame, ridicule, stress, severe mental anguish and emotional distress, and he will continue to suffer such losses and damages in the future.

### PRAYER FOR RELIEF

WHEREFORE, Mr. Hughes prays that this Court:

257.    Declare and adjudge that Defendant NFCU's employment policies, practices and/or procedures challenged herein are illegal and in violation of Title VII and Section 1981;

258.    Award injunctive relief consisting of an order prohibiting Defendant NFCU from engaging in further employment practices that create or tolerate a racially discriminatory work environment;

259.    Order Defendant NFCU to place or restore Mr. Hughes into the job he would now be occupying, but for Defendants' discriminatory policies, practices and/or procedures;

260.    Award Mr. Hughes compensatory damages in the amount to be proven at trial, but in any event not less than $600,000;

261.    Award Mr. Hughes punitive and exemplary damages in the amount to be proven at trial, but in any event not less than $800,000;

262.    Award Mr. Hughes back pay, front pay, lost benefits, preferential rights to jobs and other damages for lost compensation and job benefits with pre-judgment and post-judgment interest suffered by Mr. Hughes to be determined at trial;

263.    Award Mr. Hughes reinstatement with all back pay and benefits;

264.    Award Mr. Hughes costs and expenses of this action, including, but not limited to, reasonable attorneys' fees and expenses;

265.    Award Mr. Hughes any other appropriate equitable relief; and            .

266.    Award Mr. Hughes any such additional and further relief as this Court may deem just and proper.

## JURY DEMAND

### PLAINTIFF DEMANDS A TRIAL BY JURY FOR ALL CLAIMS SO TRIABLE.

By Counsel,

Date: December 21, 2010

J. THOMAS SPIGGLE, ESQ.  (VSB No. 72022)
**THE SPIGGLE LAW FIRM, PLLC**
4830 31st St., South, Suite B
Arlington, VA 22206
Telephone: (202) 449-8527
Fax: (202) 540-8018
Email: tspiggle@spigglelaw.com

LISA A. GOLDBLATT, ESQ.
**THE GOLDBLATT LAW FIRM, PLLC**
910 17th Street, NW, Suite 800
Washington, DC 20006
Telephone: (202) 293-2033
Fax: (202) 293-3596
Email: lgoldblatt@goldblattlaw.com

Attorneys for Plaintiff Herbert Hughes