## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

HERBERT D. HUGHES,                    )
                                      )
            Plaintiff,                )
                                      )
v.                                    )   Civil Action No. 1:10-cv-1430
                                      )
NAVY FEDERAL CREDIT UNION,            )
et al.,                               )
                                      )
            Defendants.               )

### MEMORANDUM OPINION

THIS MATTER comes before the Court on Defendants Navy Federal Credit Union's and Nancy LaRocca's Motion for Summary Judgment.[1]  This case concerns Plaintiff Herbert Hughes' ("Hughes") allegations that Defendants Navy Federal Credit Union ("Navy Federal") and Nancy LaRocca ("LaRocca") engaged in race-based discrimination and unlawful retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17 (West 2006) ("Title VII") and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 et seq. (West 1991), when they denied Hughes' promotions, subjected him to discriminatory disciplinary actions, and terminated him from

---

[1] This Motion was also submitted to the Court by Defendant Kathryn Graham-Bapple.  However, Defendant Graham-Bapple was dismissed from this case by the Court on September 30, 2011, and thus this Opinion pertains solely to Defendants Navy Federal Credit Union and Nancy LaRocca.

employment.[2]  There are four issues before the Court.  The first
issue is whether Hughes has exhausted his administrative
remedies with respect to each of his race discrimination and
retaliation claims brought under Title VII, such that those
claims are now properly before the Court.  The second issue is
whether the any of Hughes' race discrimination or retaliation
claims, brought pursuant to either Title VII or § 1981, are
time-barred.  The third issue is whether, to extent Hughes' race
discrimination claims in Counts I and II are procedurally proper
and are not otherwise time-barred, Hughes has adduced sufficient
evidence to raise the inference of race-based discrimination by
Navy Federal under either Title VII or § 1981, respectively, so
as to create a triable issue of material fact.  The fourth issue
is whether, to extent Hughes' retaliation claims in Counts III
and IV are procedurally proper and are not otherwise time-
barred, Hughes has adduced sufficient evidence of unlawful
retaliation under either Title VII or § 1981, respectively, so
as to create a triable issue of material fact.  The Court grants
Defendants' Motion for Summary Judgment because, to the extent
Hughes' claims are procedurally proper and not otherwise time-

---

[2] Hughes also alleges that Navy Federal and LaRocca engaged in
racial discrimination based on a theory of hostile work
environment when they subjected him to racial harassment.
However, by Order dated September 30, 2011, this Court dismissed
Counts I and II as moot to the extent that either alleges racial
discrimination based on a theory of hostile work environment.

barred, the Court finds that Hughes has failed to adduce
sufficient evidence that his adverse treatment by Navy Federal
and LaRocca was motivated by racial animus or amounted to
unlawful retaliation, so as to create a triable issue of
material fact.

Plaintiff Herbert Hughes is a black male citizen of the
United States, and was employed by Defendant Navy Federal from
November 29, 1999 until his termination on August 8, 2008.  Navy
Federal is a federally chartered credit union, incorporated
under the laws of Virginia, and is the largest credit union in
the United States.  Navy Federal's Mortgage Default Branch
manages the accounts of Navy Federal members who are delinquent
in their mortgage payments, and it is a Mortgage Collection
Counselor's role to contact delinquent members and help them
bring their mortgages current.  Navy Federal employs 60-day
counselors, 90-day counselors, and 120-day counselors.  These
counselors handle the accounts of members who are delinquent by
60 days or less, 60 to 90 days, and 120 days or more but not in
foreclosure, respectively.  A 60-day counselor is an entry-level
position.  A 120-day counselor is a "Senior Mortgage Collection
Counselor," and is paid more than 60-day and 90-day counselors.

Hughes began working for Navy Federal in 1999 as a
Delinquency Control Counselor, and within two years was promoted
to a 60-day counselor position in the Mortgage Collections

3

Branch.  At the time of this promotion in 2001, Defendant
LaRocca worked in the Mortgage Collections Branch as a 120-day
counselor.

Between 2002 and the summer of 2005, although characterized
differently by the parties, it is undisputed that Hughes
received both formal and informal complaints from coworkers
concerning inappropriate workplace conduct.  In May 2002,
Rebecca Tandski, a white coworker, formally complained to Navy
Federal's Employee Relations department that Hughes had made
graphic and derogatory sexual comments.  Upon Navy Federal's
investigation, although Hughes denied making the comments,
Hughes admitted to giving shoulder rubs to female employees and
complimenting other female coworkers on their appearances.
Hughes received verbal counseling and Navy Federal required him
to attend sexual harassment training.  In July 2004, Hughes was
counseled by his supervisor at Navy Federal, after he admitted
to using profanity in the workplace.  In May 2005, Mariam
Karimi, another white coworker of Hughes, complained that he
treated her unprofessionally and contended that it was hard to
distinguish when Hughes was joking or being serious.

Despite the existence of these adverse complaints, Hughes
received raises and favorable annual performance reviews from
Navy Federal during that time period.  Just two months after
Tandski made her complaint, Hughes' Performance Appraisal Report

4

("PAR") for July 2001–July 2002 issued, stating, "Herb works independently and can be relied on to complete work." In fact, his 2002 PAR does not make any mention of Tandski's complaint or the counseling Hughes received. He was even given a 3.5% raise in conjunction with the 2002 PAR. Similarly, Hughes' 2003, 2004, and 2005 PARs paint the picture of a responsible professional who was upbeat, reliable, and strove for excellence. Between 2002 and the summer of 2005, Supervisor Jim Little, prepared Hughes' PARs. Mr. Little was soon thereafter promoted, and Defendant LaRocca succeeded him as Hughes' direct supervisor at Navy Federal in August 2005.

In May 2006, Hughes applied for a position as a 120-day counselor, or Senior Mortgage Collection Counselor ("SMCC"). That June, seven applicants, including Hughes, took a written examination for the SMCC position. Hughes was the only black applicant to take the examination, and the only applicant to pass the examination. Between 2001 and 2006, no blacks were employed by Navy Federal as SMCCs. Although other applicants who failed the examination were interviewed for the SMCC position, only Hughes was subjected to a three-person interview panel, which included Hughes' former direct supervisor, Jim Little, and Hughes' new direct supervisor, Defendant LaRocca.

That same month, Hughes had posted a poem in his cubicle entitled, "Being Black in the Workplace." LaRocca told Hughes

to remove the posting, claiming that some Navy Federal employees found it offensive.  Although Hughes initially resisted, believing the directive to be discriminatory, he ultimately complied and took down the poem.

While a decision regarding the open SMCC position was pending during the summer of 2006, Karyn Mapp, a black coworker of Hughes, complained that Hughes had been engaging in highly inappropriate behavior toward her in the workplace.  Ms. Mapp met with LaRocca, and also with Susan Shawkey from Employee Relations, to discuss her concerns about Hughes.  Ms. Mapp revealed that Hughes had given her the middle finger, stuck his tongue out at her, and grabbed her wrist to hold her in place.  Ms. Mapp further stated that Hughes made the following comments to her:  (1) "Your chest is coming out of your shirt;" (2) You shouldn't wear that anymore;" and (3) "Your chest is out there." Following this meeting, Employee Relations commenced a further investigation into Hughes.

The Employee Relations investigation uncovered a handful of other co-workers of Hughes', all of whom corroborated his brazen and unseemly demeanor.  Jillian West, an employee in Mortgage Collection, confirmed that she had seen Hughes give Ms. Mapp the middle finger, and say "You know you love me" to a disgusted-looking Ms. Mapp.  JoAnne Anderson, a Mortgage Collection Counselor who sat next to Hughes, informed Employee Relations

that Hughes had made inappropriate comments to another employee, such as "You're my girl" or "You're my girlfriend." Veronica Romero-Duarte informed Employee Relations that Hughes had a poor work ethic and had made comments like "I won't be your boyfriend if you don't notate this account," and "Oh, I don't love you anymore." Victoria Ryan, a SMCC, reported that Hughes took long smoking breaks and had given his coworker, Annie Coggins, the middle finger. Ms. Ryan also reported that Hughes had commented to her: (1) "If you get fat, I'm not talking to you;" and "You're looking good, don't gain weight! Shirt tight, pants tight." Erin Varnau, another coworker of Hughes, confirmed his poor work ethic to Employee Relations and stated that Hughes had told her, "If you weren't married, I'd be your boyfriend." On August 21 and 22, 2006, Employee Relations met with Hughes to discuss the concerns raised by its investigation. At that meeting, Hughes acknowledged that "some things I say and do may offend people."

On August 31, 2006, LaRocca, Mr. Little, and a representative from Employee Relations told Hughes that he was not selected for the SMCC position that he had applied for in May. Specifically, Mr. Little rated Hughes a "Low Satisfactory" for the position, noting that Hughes "ha[d] not demonstrated the necessary interpersonal communication and leadership skills required to fill the position." Hughes was further advised to

improve his behavior so that he would meet the professionalism standards expected of a Navy Federal employee.

In September 2006, Hughes received his 2006 PAR in which LaRocca, Mr. Little, and Joan Cox (VP of Real Estate Lending for Navy Federal) rated his overall performance as "Not Fully Effective." Specifically, Hughes' PAR noted that he had been counseled for making inappropriate and offensive gestures, and had displayed a lack of respect toward the senior staff. The 2006 PAR placed him on 180-day conditional employment status, during which he was ineligible for promotion. The following month, Hughes met with Employee Relations to discuss his perception that his non-selection for the SMCC position and the 2006 PAR was discriminatory, and that both adverse occurrences were motivated by the fact that he was black. Employee Relations evaluated Hughes' discrimination concerns, but concluded and communicated to Hughes that both Navy Federal's decision not to promote him to SMCC and his 2006 PAR were justified based on significant concerns corroborated by multiple employees.

On November 21, 2006, Hughes sent a letter to Ms. Cox, repeating the same discrimination concerns he had raised during the Employee Relations meeting. Hughes copied his letter to Cutler Dawson, President of Navy Federal, and several other corporate Vice-Presidents. While Ms. Cox responded that she

could find "no evidence of discrimination" perpetrated against Hughes, she did conclude that Hughes' conduct "did not demonstrate the behavior expected of an employee in a senior position."

On January 2, 2007, Melissa Reakenwalt, a black coworker, authored a letter (the "Reakenwalt Letter") to the Vice-President of Human Resources of Navy Federal, stating that LaRocca had sabotaged Mr. Hughes' application for a promotion "to send a message to other blacks in the Mortgage Default Section, that you will not be promoted."  Approximately two weeks later, Hughes was told he would be offered a promotion to the SMCC position.

In March 2007, LaRocca and Mr. Little prepared Hughes' 2007 PAR in which they rated him "Meets Expectations," and which removed Hughes from conditional employment status.  On March 27, 2011 Hughes was promoted to the SMCC position for which he had been denied advancement just six months earlier, and received a pay and grade level increase.  The decision to promote Hughes was made by LaRocca, Mr. Little, and a new supervisor, Ms. Graham-Bapple.

On August 15, 2007, Hughes applied for the posted position of "Mortgage Default Analyst," and was not selected.  This position was eventually filled by Jennifer Felts, who is white. On August 22, 2007, Hughes applied for the posted position of

"Business Loan Underwriter," and was not selected.  In fact, this position was never filled because it was eventually subsumed by a more senior position, "Business Loan Underwriter II."

By the fall of 2007, Hughes' work performance was again in question.  On September 7, 2007, Hughes was counseled for failing to note in a customer's file that he had ordered a broker price opinion, which resulted in a duplicitous broker price opinion being ordered by another Mortgage Collection Counselor, and ultimately caused Navy Federal to miss a foreclosure sale and charge off $75,000.  On October 3, 2007, Hughes was again counseled for a recurring problem of writing up foreclosure reviews on accounts that were being monitored, which resulted in Navy Federal incurring additional attorneys' fees.  Later that month, Joanne Anderson, a fellow SMCC, accused Hughes of taking files from her desk.  Although Hughes' desk was searched, the files were eventually located among Anderson's own files.  Ms. Anderson retired three months later.

Throughout 2007, the number of mortgage delinquencies rose at Navy Federal and nationwide.  In response, Navy Federal hired two additional SMCCs: Marie Hamilton, who is black, in late 2007; and Christopher Lockbaum, who is white, on March 10, 2008.  Despite the addition of two SMCCs, Hughes' workload remained stressful because both Ms. Hamilton's and Mr. Lockbaum's need

10

for on-the-job training resulted in their minimal productivity. By January 2008, Hughes had become responsible for (1) drafting nearly 30 write-ups for delinquent mortgage accounts, (2) assisting the 60-day and 90-day counselors, (3) sending out demand letters to delinquent clients, (4) training the new SMCC, Ms. Hamilton, and (5) speaking with Navy Federal members who were more than 120 days delinquent in their mortgage payments. When Mr. Lockbaum was hired, Hughes also spent a significant amount of time training him and correcting his errors.  Hughes alleges that white, SMCCs were not assigned comparably heavy workloads.

Hughes also alleges that, because he is black, Navy Federal ignored his suggestions and ideas, and denied giving him credit for accomplishments, but implemented and supported the suggestions of his white coworkers.  In December 2007, Hughes proposed the idea of no-cost loan modifications to LaRocca, which LaRocca ignored.  In May 2008, when Mr. Lockbaum presented the idea of no-cost modifications, LaRocca implemented it.  In February 2008, Hughes suggested a stream-lined approach for dealing with pre-foreclosure delinquencies, which involved waiting an additional month before initiating foreclosure proceedings.  The very next month, Mr. Little implemented Hughes' one-month delay approach company-wide, but did not credit Hughes with the idea.  Hughes also claims to introducing

11

to Navy Federal the idea of a delinquency rider, or "modified modification." Although this idea was ignored by Navy Federal at first, the idea was eventually adopted after Hughes' termination.

Internally, changes were occurring within Navy Federal's mortgage management team to help manage the pressure caused by the national foreclosure crisis. In July 2007, Mr. Little was promoted again to Assistant Vice-President of Mortgage/Equity Collections. LaRocca was promoted to succeed him as Manager of the "Mortgage Default Management Branch" on January 11, 2008, and Victoria Ryan was promoted to LaRocca's former position, becoming Hughes' direct supervisor. Ms. Ryan was Hughes' direct supervisor from October 2007 until her transfer to Herndon, Virginia in July 2008.[3]

Yet despite his significant workload in late 2007 and early 2008, Hughes again required repeated counseling. While supervising Hughes, Ms. Ryan was compelled to counsel him for (1) failing to update the value of certain properties, (2) failing to consider existing account notes which resulted in duplicitous actions being taken, (3) notating accounts unclearly, (4) sending out incorrect demand letters, (5)

---

[3] Mr. Lockbaum was immediately promoted to replace Ms. Ryan, and became Hughes' direct supervisor during the final weeks of his employment with Navy Federal.

recommending a foreclosure when payments were being collected, and (6) allowing files to remain unmonitored for six to ten months. After each reprimand, Hughes denied wrongdoing and attempted to explain that each account at issue was not one that he was working on at the time. Hughes alleges that white employees similarly situated were not reprimanded for their performance issues.

On June 27, 2008, Ms. Ryan and LaRocca met with Employee Relations to discuss Hughes' performance deficiencies. Several days later, they met with Mr. Lockbaum who confirmed that he had overheard Hughes asking female employees, "Would you mind helping me relieve my pressure?" and also stating, "Don't take me to Human Resources." Employee Relations was informed by SMCC Marie Hamilton that Hughes flirted with every single woman he saw. Carfi Lazare, a black Mortgage Collection Counselor, stated that Hughes commented to her, "You should go out with me" and "If you weren't married, I'd be your boyfriend." Ms. Lazare received so much inappropriate attention from Hughes that she ultimately asked her boyfriend to intervene and compel Hughes to desist. Finally, Ryan Smith, a black female coworker, reported that Hughes pulled her arm, made grabbing gestures toward her, and was very flirtatious. Ms. Smith stated that this conduct from Hughes was also accompanied by the following comments to her: (1) "I can give you enough" or "I'm going to give it to

13

you good; and (2) "I have a wife, but I don't like her.  That's why I have a mistress."

On August 1, 2008, Employee Relations placed Hughes on paid administrative leave, despite Hughes' denials of engaging in inappropriate workplace conduct.  A week later on August 8, 2008, Hughes was told that his employment with Navy Federal had been terminated.  A final PAR was issue to Hughes that same day, rating his overall performance as "Ineffective," and terminating his employment for persistent inappropriate behavior and poor work performance.  Despite a vast and troubling personnel file, Hughes alleges that the failures to promote, the adverse disciplinary actions and PAR assessments, and his termination were the product of decisions motivated by his race, and amount to unlawful retaliation.

Hughes filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), setting forth claims of race discrimination and age discrimination.  Although Hughes "checked" the boxes on the Charge Notice for "race" and "age" discrimination, Hughes did not "check" the box for retaliation. In his Charge Notice particulars, Hughes writes:

> I was hired by Navy Federal Credit Union on 11/29/99. On
> 08/01/08, I was placed on administrative leave by Manager
> Nancy LaRocca. On 08/08/08, I worked as a Pre-Foreclosure
> Specialist when I [sic] told I was discharged by Human
> Relations representative Susan Shawkley [sic]. I was not
> given a reason for being placed on administrative leave or
> for being discharged. However, during my tenure I have
> applied for and been denied promotions which have been

14

granted to younger, non-Black employees. I believe I have been discriminated against based on race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended. I believe I have been discriminated against based on my age, 52, in violation of the Age Discrimination in Employment Act of 1964, as amended.

On September 29, 2010, the EEOC issued Hughes a Notice of Right to Sue against Navy Federal, and he timely initiated this suit within 90 days of his receipt of the Notice on December 21, 2010.

In his Complaint, Hughes alleges the following Counts: I (Race Discrimination under Title VII); II (Race Discrimination under § 1981); III (Retaliation under Title VII); IV (Retaliation under § 1981); V (Tortious Interference Against Defendant LaRocca; and VI (Tortious Interference Against Defendant Graham-Bapple. On July 18, 2011, Hughes filed a Consent Motion to Dismiss Counts V and VI of the Complaint and Defendant Graham-Bapple. By Order dated September 30, 2011, this Court granted that Motion, dismissing (i) Counts V and VI from Hughes' Complaint, (ii) Defendant Graham-Bapple from the case, and (iii) Counts I and II of the Complaint to the extent each alleges racial discrimination based on a theory of a hostile work environment. Defendants Navy Federal and Nancy LaRocca now move the Court for summary judgment on the remaining Counts pursuant to Federal Rule of Civil Procedure 56.

The Court will grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." FED.
R. CIV. P. 56.  Rule 56 mandates the entry of summary judgment
against a party who fails to make a showing sufficient to
establish the existence of an element essential to that party's
case.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The
Court construes all reasonable inferences in favor of the non-
moving party when determining whether there is a genuine issue
of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 255 (1986).  The mere existence of some disputed facts does
not merit a trial unless the disputed facts are material to an
issue necessary for proper resolution of the case and the
quality and quantity of the evidence offered to support a
question of fact are adequate to support a jury verdict.
Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d
1317, 1323 (4th Cir. 1995).

Prior to filing a civil action under Title VII, a plaintiff
must first file a Charge of Discrimination with the EEOC or the
state deferral agency, thereby exhausting his administrative
remedies.  See 42 U.S.C. § 2000e-5(e)(1) (West 2009); Miles v.
Dell, Inc., 429 F.3d 480, 491 (4th Cir. 2005).  While "[t]he
EEOC charge defines the scope of the plaintiff's right to
institute a civil suit," "[a]n administrative charge of
discrimination does not strictly limit a Title VII suit which
may follow; rather, the scope of the civil action is confined

16

only by the scope of the administrative investigation that can
reasonably be expected to follow the charge of discrimination."
Miles, 429 F.3d at 491 (quoting Bryant v. Bell Atlantic
Maryland, Inc., 288 F.3d 124, 132 (4th Cir. 2002)).  Indeed,
courts liberally construe charges of discrimination.  Chacko v.
Patuxent Inst., 429 F.3d 505, 509 (4th Cir. 2005).  Therefore,
"if a plaintiff's claims in [his subsequent] judicial complaint
are reasonably related to his EEOC charge, and can be expected
to follow from a reasonable administrative investigation, the
plaintiff may advance such claims in his subsequent civil suit."
Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir.
2000).

Here, notwithstanding the issue of timeliness, all of
Hughes' discrimination and retaliation claims under Title VII
are either part of or reasonably related to his Charge, and can
expected to follow from a reasonable investigation.  With
respect to his race discrimination claims, Hughes alleges race
discrimination by Navy Federal based on three discrete types of
actions:  failure to promote, discriminatory discipline, and
discriminatory termination.  Not only did Hughes' "check the
box" for discrimination based on race, but in the narrative
portion of the Charge, Hughes states that he was "denied
promotions," and not given a reason for his discharge.  The
narrative further expresses how he believes he suffered

17

adversely because of his race.   Therefore, Hughes unequivocally
lays a foundation for subsequent judicial action for race
discrimination founded on the discrete acts of failure to
promote and discriminatory termination.   To the extent Hughes
expression is more nuanced with respect to whether Navy Federal
engaged in discriminatory discipline, the Court finds these
discrete acts by Navy Federal are reasonably related to the
substance of Hughes' Charge, namely, adverse treatment based on
race, and can be expected to follow upon reasonable
investigation.   Accordingly, all of Hughes' claims for
discrimination under Title VII in Count I are properly within
the scope of his EEOC Charge.

Similarly, Hughes' retaliation claims under Title VII in
Count III are properly before the Court because his claims are
reasonably related to the EEOC Charge and can be expected to
follow from a reasonable investigation.[4]   Although Navy Federal
argues that Hughes failed to administratively exhaust his claims
for retaliation because he did not "check the box" or expressly
discuss it in the Charge narrative, Hughes' claims may still

---

[4] "Section 1981 does not require a plaintiff to exhaust
administrative remedies before filing a civil action in district
court." Muhammad v. Giant Food, Inc., 2000 WL 1828248, at *6
(D. Md. 2000) (citing Johnson v. Ry. Express Agency, Inc., 421
U.S. 454, 461 (1975).   Therefore, unless otherwise time-barred,
Plaintiff's discrimination and retaliation claims under § 1981
in Counts II and IV can be considered on their merits.

survive so long as they are reasonably related to the EEOC charge.  In fact, the narrative portion of his Charge explains how Hughes believes he was wrongfully discharged, but was then given no reason for his termination.  This same modus operandi is common in retaliation cases in which a plaintiff is terminated from employment, with little or no explanation from the employer, after engaging in a protected activity.  Although Hughes does not state that he believes he was discharged after engaging in a protected activity, Hughes filed his Charge pro se, and the law does not impose upon an unrepresented complainant the burden of making out a prima facie case in his EEOC Charge.  For these reasons, Hughes' retaliation claims under Title VII are reasonably related to his EEOC Charge, can be expected to follow from a reasonable administrative investigation, and are thus properly before the Court.

Equally important is the pillar of procedure that a Title VII Charge must be filed within 300 days of the adverse action. 42 U.S.C. § 2000e-5(e)(1); see also Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007).  This rule applies to discrete acts of discrimination, such as failure to promote, which a plaintiff may allege form independent bases for finding discrimination in violation of Title VII.  Mezu v. Morgan State Univ., 367 Fed. Appx. 385, 388 (4th Cir. 2010) (quoting Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 621

19

(2007)). Similarly, the statute of limitations for § 1981 claims is four years. Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 370 (2004).

Here, Hughes' race discrimination claims under Title VII stemming from Navy Federal's failure to promote him are time barred because the dates of promotion denials for each of the positions Hughes' alleges Navy Federal failed to select him for occurred more than 300 days prior to Hughes' Charge filing date. Hughes learned in August 31, 2006 that he did not receive the promotion to Senior Mortgage Collection Counselor. However, he did not file his EEOC charge under August 12, 2008, over 700 days later and far beyond the strictly applied 300-day Title VII limitations period. Even the August 2007 promotion denials for the "Mortgage Default Analyst" and "Business Loan Underwriter" positions, although a year later, still occurred prior to absolute 300-day outside window under Title VII. For these reasons, Hughes' race discrimination claims in Count I may proceed, but without failure to promote as a basis for establishing race discrimination in violation of Title VII.

Similarly, Hughes' race discrimination claims under § 1981 stemming from Navy Federal's failure to promote him are time barred in part because, with respect Hughes' initial denial of the SMCC position in August 2006, Hughes' Complaint was filed outside § 1981's four-year limitations period. Hughes filed the

20

instant action on December 10, 2010.  Thus, his failure to
promote claim concerning the August 2006 SMCC promotion denial
brought under § 1981 is also time-barred because four and one-
half years passed from the denial of the promotion to when the
suit was brought under § 1981.  However, Hughes' failure to
promote claims concerning the August 2007 promotion denials for
the "Mortgage Default Analyst" and "Business Loan Underwriter"
positions are not time barred because only three and one-half
years had passed when Hughes filed suit on December 10, 2010.
Because the § 1981 limitations period did not run with respect
to these two promotion denials, Hughes' failure to promote
claims for race discrimination in Count II under § 1981 may
proceed, except for Hughes' claim concerning his initial
promotion denial to the SMCC position in August 2006.

     In order to recover for failure to promote, discriminatory
discipline, or discriminatory termination claims of race
discrimination under Title VII or § 1981, a plaintiff must
establish that his race was a factor in the decision at issue in
one of two ways:  by producing direct evidence that his race was
a factor in the defendant's decision, or by proffering indirect
evidence that could reasonably create an inference of
discrimination.  Adams v. Univ. of North Carolina-Wilmington,
640 F.3d 550, 558 (4th Cir. 2011) (quoting Chalmers v. Tulon
Co., 101 F.3d 1012, 1017 (4th Cir. 1996).  Direct evidence

consists of express statements by decision-makers that the plaintiff's race was a motivating factor in causing the adverse employment decision.  Id.

Where a plaintiff has no direct evidence of discrimination, the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), burden-shifting analysis applies, both in Title VII and § 1981 cases.  Lewis v. Cent. Piedmont Cmty. Coll., 689 F.2d 1207, 1209 n.3 (4th Cir. 1982) ("[I]t has been held, and we think correctly, that the McDonnell Douglas criteria apply equally to cases arising under Title VII or § 1981") (citing Hudson v. Int'l Bus. Mach. Corp., 620 F.2d 351, 354 (2d. Cir. 1980)). Under that standard:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination.  Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the [plaintiff's] rejection." . . . Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 248 (1981) (quoting McDonnell Douglas, 411 U.S. at 802.)  It is well-settled that "[a] plaintiff's own self-serving opinions, absent anything more, are insufficient to establish a prima facie case of discrimination."  Mackey v. Shalala, 360 F.3d 463, 469-70 (4th Cir. 2004) (internal citation omitted).  Further, in

the absence of direct evidence, a plaintiff must provide

"circumstantial evidence of sufficiently probative force to

raise a genuine issue of material fact." Evans v. Techs.

Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

Thus, after reviewing the record as a whole, if this Court

concludes that no reasonable jury could return a verdict for

Hughes, summary judgment for the Defendants is warranted and

proper. Anderson, 477 U.S. at 248.

The framework for establishing a prima facie case of race

discrimination for failure to promote under Title VII or § 1981

is well-settled. By a preponderance of the evidence, a

plaintiff must demonstrate: (1) he is a member of a protected

group; (2) he applied for the position in question; (3) he was

qualified for the position; and (4) he was rejected for the

position under circumstances giving rise to an inference of

unlawful discrimination. Brown v. McLean, 159 F.3d 898, 902

(4th Cir. 1998). With respect to the third element, an employee

cannot use his own judgment to evaluate his qualifications; it

is the employer's prerogative to establish the relevant criteria

and expectations for continued employment. Anderson v.

Westinghouse Savannah River Co., 406 F.3d 248, 269 (4th Cir.

2005). As such, absent evidence of retaliatory motive, the

Court will leave the employer as the judge of the employee's job

performance.  Beall v. Abbott Labs., 130 F.3d 614, 620 (4th Cir. 1997).

    Hughes purports to have direct evidence of race discrimination in the form of the January 2, 2007 Reakenwalt Letter, however, the Court finds this letter not credible and inadmissible.  In her deposition, Ms. Reakenwalt, the purported author of this letter, testified that much of the letter was inaccurate, causing her to believe she did not write it.  Ms. Reakenwalt recalls that Hughes came to her and asked her to write a letter on his behalf, however, she did not respond to his request.  While admitting to drafting some kind of support for Hughes, Ms. Reakenwalt testified that she did not recall putting the text into a letter or emailing the text to Hughes, although he received possession of it and it appeared to come from her email account.  Particularly troubling is Hughes' admission in his own deposition that he altered the Reakenwalt Letter.  While Hughes only admits that he changed the greeting line from "To whom it may concern" to "To Louise Foreman, Vice President of Human Resources," it is apparent additional alterations were made to the content of the letter.  As such, the Court finds the Reakenwalt Letter inadmissible and declines to consider it.[5]

_____

[5]Assuming arguendo that this direct evidence is admissible, this evidence still only pertains to Hughes' 2006 SMCC promotion

In this case, because Hughes can offer no direct evidence of race discrimination for failure to promote, he must adduce sufficient indirect evidence under the McDonnell Douglas analysis to establish a prima facie case of race discrimination for failure to promote under § 1981. With respect to Hughes' two August 2007 promotion denials, it is clear that the first two elements of the prima facie case are satisfied; Hughes is a black male, and applied in August 2007 for the positions of "Mortgage Default Analyst" and "Business Loan Underwriter." However, the parties dispute both whether Hughes was qualified for these positions, and whether Navy Federal's failures to promote Hughes raise the inference of discrimination.

Naturally, Hughes contends that he was qualified for both positions and that Navy Federal's failures to promote him raise the inference of discrimination. Hughes asserts that he had satisfactory job performance, had received favorable PARs seven out of nine times, and had a significant wealth of experience at the time he was denied promotions in August 2007. Further, Hughes contends the denials were discriminatory because, given his good behavior and experience, and given the fact that he had been asked to take down his poem "Being Black in the Workplace"

_____

denial. As discussed infra, Hughes' 2006 SMCC failure to promote claims under both Title VII and § 1981 are time-barred.

and whistle-blown within the prior year in 2006, race had to have been a factor in Navy Federal's decision not to promote.

While Hughes' statements of events are valid, his assertions that he was qualified for these positions or that his denials were discriminatory are not. Although Hughes was a veteran, had managed to keep himself under the human resources radar for about nine months, and had received a promotion, Navy Federal had any number of non-discriminatory reasons not to promote Hughes further. The evidence establishes that Hughes was a recently-promoted SMCC with troubling employment history at the time he was denied these two promotions, and the Court will not second guess an employer's business judgment in its criteria and selection of employees. Critically, Hughes, whom the burden is upon, has introduced no evidence that indicates that his promotion denials were motivated by any race-based factor or retaliatory motive.[6] Hughes instead asks this Court to assume that because he was asked to remove an ethnic poem from his cubicle and reported discrimination to his employer during the prior year, he was thus qualified for these positions and his subsequent denials in August 2007 must have been racially

---

[6] What evidence has been introduced on this point demonstrates that Ms. Felts, who received one of the two promotions at issue, had previously performed the analytical duties required of the position on a temporary basis, and was also selected based on her successful past performance with Navy Federal.

motivated.  The Court simply cannot make such a magical
evidentiary leap, particularly when Hughes actually received a
promotion between the August 2007 promotion denials and the
events he asserts were the discriminatory catalysts for those
denials.  As such, Hughes has not established that he was
qualified for the two positions in August 2007 or that Navy
Federal's denials were discriminatory.  Because Hughes has not
established a prima facie case of failure to promote under §
1981, the Court need not wander into the second and third steps
of the McDonnell Douglas analysis to search further for an
inference of discrimination.  Accordingly, with respect to
Hughes' failure to promote claims for race discrimination in
violation of § 1981 in Count II, summary judgment for the
Defendants is warranted and proper.

     The McDonnell Douglas approach applies equally to Hughes's
discriminatory discipline and discriminatory termination claims
of race discrimination under Title VII and § 1981.  To establish
a prima facie case of race discrimination for these disparate
treatment claims, a plaintiff must demonstrate that:  (1) he is
a member of a protected group; (2) he has satisfactory job
performance; (3) he was subjected to adverse employment action;
and (4) similarly situated employees outside his class received
more favorable treatment.  Coleman v. Maryland Court of Appeals,
626 F.3d 187 (4th Cir. 2010).  Consequently, the Fourth Circuit

has concluded that inappropriate behavior and poor performance preclude a plaintiff from both establishing a prima facie case of discrimination and staving off summary judgment. See Morrall v. Gates, 370 Fed. Appx. 396, 398 (4th Cir. 2010) (affirming summary judgment on grounds that plaintiff had "demonstrated disrespectful and disruptive conduct"); Chao v. Int'l Bus. Mach. Corp., 424 Fed. Appx. 259 (4th Cir. 2011) (affirming summary judgment when record was "replete with examples of [plaintiff's] insubordination, costly technical errors, and poor performance reviews").

Defendants concede the first and third elements while disputing that Hughes performed satisfactorily and that similarly situated white employees received more favorable treatment. Hughes contends that he had satisfactory job performance at Navy Federal and was good at his job, receiving seven out of nine favorable PARs during his employment. Hughes also asserts that his white counterparts received more favorable treatment than he did. Specifically, Hughes contends that Mr. Lockbaum, a white SMCC, was not reprimanded for failing to meet quotas and, in fact, leap-frogged over Hughes after only working at Navy Federal for five-months, contrasted by Hughes' nearly nine years. Hughes claims that LaRocca simply handpicked Lockbaum based on a subjective determination, motivated by racial animus, that Mr. Lockbaum was the most qualified.

28

However, Hughes did not have satisfactory job performance; rather, he had remarkably troubling job performance.  Throughout the latter half of his employ, Hughes was repeatedly disciplined, coached and counseled about his sexually inappropriate comments to female co-workers.  And despite the significant opportunities afforded him, Hughes continued to engage in a pattern of unseemly conduct.  The record is replete with inappropriate and sexually explicit comments Hughes made to more than half a dozen women over at least a four-year time period.  Moreover, Hughes actual performance was sub-par.  The evidence is as persuasive as it is pervasive that Hughes was an inconsistent performer, took excessive work breaks, regularly failed to review work product, and spoke to members of Navy Federal inappropriately.  Although Hughes generally received favorable PARs, he received two significantly poor reviews in 2006 and 2008, which reflect Defendants' obvious frustration with him and imply their longstanding willingness in the earlier years of Hughes' employment to give him the benefit of the doubt.  In the end, Hughes simply has offered no sufficiently probative evidence that he performed his job satisfactorily, and thus no rational fact-finder could draw a contradictory conclusion from this evidence adduced here.  Accordingly, Hughes did not have satisfactory job performance as a matter of law.

Similarly, Hughes has not demonstrated that his white counterparts received more favorable treatment than he did. While Hughes asserts that Defendants engaged in discriminatory discipline by failing to reprimand Mr. Lockbaum when he made significant mistakes or failed to meet his quota, these assertions are supported by insufficient evidence. Although Hughes uses deposition testimony from a coworker to show that she believed the procedure Defendant LaRocca used to promote Mr. Lockbaum was unfair, she fails to go on and further state why. Even so, no construction of her testimony supports an inference of discrimination.

Hughes further seeks to establish that his white counterparts received more favorable treatment than he by contending that he was the whipping boy for his co-workers' mistakes. In 2007, Hughes was counseled for causing Navy Federal to miss a foreclosure sale and for writing up reports for monitored accounts. Although Hughes claims his innocence, he adduces not a scintilla of evidence that establishes that these mistakes were instead performed by white coworkers, let alone that the mistakes of white coworkers went unpunished. Hughes' allegations on this point are threadbare, and without more, his self-serving opinions are insufficient to establish the presence of similarly situated comparators as a matter of law. Because Hughes has failed to establish a prima facie case

of race discrimination for these disparate treatment claims, the Court need not explore this case through the lens of McDonnell Douglas any further. Accordingly, with respect to Hughes' discriminatory discipline and discriminatory termination claims for race discrimination in violation of Title VII and § 1981 in Counts I and II, summary judgment for the Defendants is proper.

Retaliation claims under both Title VII and § 1981 are similarly analyzed under the McDonnell Douglas framework. Chao, 424 Fed. Appx. at 261. If a plaintiff can establish a prima facie case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action. Baqir v. Principi, 434 F.3d 733, 747 (4th Cir. 2006). If the employer makes such a showing, the burden returns to the plaintiff to demonstrate that this reason is a pretext for retaliation. Id. To establish a prima facie case of retaliation, a plaintiff must prove three elements: (1) that he engaged in a protected activity; (2) that his employer took an adverse employment action against him; and (3) that there was a causal link between the two events. Ziskie v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008). Only the second and third elements are at issue here.

Hughes asserts that he suffered adverse employment action at the hands of Defendants because they gave him more work, reprimanded him, and ultimately terminated his employment after

31

he complained about race discrimination in his workplace. However, not all unfavorable workplace events rise to the level of legally sufficient adverse employment action for purposes of proving a prima facie case of retaliation. See Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006) (concluding that the challenged action must be materially adverse, that is, it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination). The Fourth Circuit has affirmed summary judgment for employers when the alleged retaliatory acts included "receiving unfavorable assignments, verbal counseling, unfavorable reviews, and denial of opportunities for advancement" because these occurrences would not discourage a reasonable employee from filing an EEOC Charge. See Gordon v. Gutierrez, 2007 WL 30324, at *9 (E.D. Va. 2007), aff'd, 250 Fed. Appx. 561 (4th Cir. 2007).

Here, all of the alleged retaliatory acts by Hughes, except for his termination, are legally insufficient to constitute material adverse employment action. The conduct alleged by Hughes is essentially identical to the facts in Gordon; unfavorable circumstances, undoubtedly, but not amounting to materially adverse employment action. Assuming as true Hughes' assertions and scant evidence that Defendants did give him more work than similarly situated white colleagues, were quick to reprimand him for the mistakes of other white employees, and

32

refused to assist him when he asked for help with tasks, none of these occurrences constitutes adverse employment action because a reasonable employee would not be discouraged by this conduct from filing an EEOC Charge against Defendants. Consequently, only Defendants' act of terminating Hughes amounts to legally sufficient adverse employment action toward establishing a prima facie case of retaliation under Title VII or § 1981.

With respect to his termination, Hughes asserts that this act of retaliation was in response to and causally linked with his complaints of discrimination to Navy Federal. Hughes first complained of discrimination at the time he instructed to remove the poem, "Being Black in the Workplace" from his cubicle. He next complained of discrimination to Defendants several months later when his negative 2006 PAR was issued. Significantly, his final complaint about race discrimination was made when he submitted a letter to Ms. Cox in November, 2006. However, Hughes wasn't terminated until August 8, 2008 – twenty months later. This lengthy passage of time is crippling to Hughes' ability to show causality. In fact, the Supreme Court has concluded that, by itself, a twenty month gap between events suggests "no causality at all." Clark Cnty. Sch. Dist. V. Breeden, 532 U.S. 268, 273-74 (2001). Even more telling is that fact that during this twenty month period following his complaints of discrimination to Defendants, Hughes received the

significant promotion to SMCC and two pay raises.  The existence of these facts together forecloses any possibility that a causal connection exists.  Because Hughes is unable to demonstrate that his termination was causally connected to his reporting discrimination to Defendants, he fails to establish a prima facie case of retaliation.  Accordingly, with respect to Hughes' unlawful retaliation claims in violation of Title VII and § 1981 in Counts III and IV, summary judgment for the Defendants is proper.

For the foregoing reasons, the Court will grant Defendants Navy Federal Credit Union's and Nancy LaRocca's Motion for Summary Judgment.

An appropriate order shall issue.

_____/s/_____
Claude M. Hilton
United States District Judge

Alexandria, Virginia
January 4, 2012